**Affirmed and Memorandum Opinion filed September 18, 2012.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-11-00690-CR

---

**RICARDO SANCHEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 185th District Court
Harris County, Texas
Trial Court Cause No. 1270992**

---

## M E M O R A N D U M   O P I N I O N

After the trial court denied appellant's motions to suppress, he pled guilty to possession with intent to deliver cocaine weighing more than 200 grams and less than 400 grams. The court sentenced appellant to 25 years' imprisonment pursuant to a plea agreement, which allowed appellant to appeal the trial court's rulings on the motions to suppress. In four issues, appellant contends the trial court erred by denying his motions to suppress. We affirm.

## BACKGROUND

In late 2008 or early 2009, Agent Ralph Ohland of the Texas Department of Public Safety (TDPS) began investigating appellant after a cooperating individual indicated to Ohland that appellant was trafficking drugs and weapons. Ohland was a member of the Multiagency Gang Task Force, which included officers from the TDPS, Federal Bureau of Investigation (FBI), Houston Police Department (HPD), and Harris County Sheriff's Office. Ohland led the team investigating appellant on July 17, 2010, including FBI Agent Keith Koncir, HPD Officer Abe Vanderberry, and TDPS Agent Cliff Manning.

The officers arrived at appellant's house at about 4:30 p.m. or 5:00 p.m. to conduct surveillance. After about 20 minutes, appellant's wife, Jaquelin Gomez, drove away from the house with her infant child. Ohland and Manning followed Gomez. Appellant left the house in another vehicle; Koncir and Vanderberry followed appellant. Vanderberry radioed for a marked HPD unit to initiate a stop after appellant committed traffic violations. Ohland also went to the scene of the traffic stop, and appellant was arrested after he gave officers a false name and date of birth. *See* Tex. Penal Code Ann. § 38.02 (Vernon 2011). The officers returned to appellant's house; Gomez had not yet returned. Koncir explained, "I think the intent was to come back and try to search the residence, either on consent or — I know they brought out a dog, a drug dog."

Appellant's house had an attached carport that was completely enclosed by a wrought iron gate extending from the ground to the top of the carport. The gate had a door that was not locked and a "beware of dog" sign was attached to the gate. To approach the front door of the house, someone would need to enter the gated carport area.[1] Inside the carport area was a "pit bull type" dog and a kennel. Koncir testified that he locked the dog in the kennel without walking inside the carport area; according to Koncir, he "talked the dog into the [kennel]. And when the dog got in, I reached through the gate and I closed the kennel."[2] Ohland and Vanderberry testified that the purpose of

---

[1] Part of the front of the house was not enclosed by the wrought iron gate.

[2] Vanderberry testified, "I think there was a broom and the dog got nervous and went in . . . ."

putting the dog in the kennel was for the officers' safety and to enable a drug dog to sniff the exterior of the house.

A K-9 unit was called to the house, but the drug dog did not alert after sniffing the exterior front of the house. Ohland admitted to entering the carport area around that time, and Vanderberry testified that he saw the K-9 officer enter the carport area.[3] Ohland testified that the officers did not have probable cause or consent to enter the house at that point.

Shortly after 8:00 p.m., an SUV parked about five houses down the street. Vanderberry testified that two women exited the vehicle and approached him and Koncir.[4] The women spoke with the officers for about 30 minutes. Ohland testified that they were "trying to get information from us." Vanderberry asked them for some identification, and they all walked over to the SUV. It was dark outside by this time, but Vanderberry could see that the inside of the vehicle was "fogged up." He "illuminated the vehicle and Jaquelin Gomez was hiding in the back seat." He testified that she was "laying down almost on the floor trying to hide or conceal herself from us." The two women identified Gomez. Vanderberry testified that Gomez "got out freely" from the vehicle.

Ohland approached the vehicle. He testified that Gomez appeared nervous. He told Gomez that appellant had been arrested, and then it "started to rain very heavily." Koncir testified that Gomez's baby started crying, and he asked her if she wanted to go back to the house to get the baby some food or put the baby down; "she agreed, said that was fine." Ohland testified:

> Koncir asked her if she would like to go into the home to get out of the rain
> . . . She said, Yes, I would. We asked if she had any documentation that

---

[3] Koncir testified that no one opened the gate to the carport area until Gomez later arrived at the residence.

[4] The two women were appellant's sister and niece. They testified during the suppression hearing. The court noted that it considered some of the "contradictory testimony" given by the women but apparently found them not credible.

3

would identify the defendant.  She said she wasn't sure.  She didn't know if she did or not.  We asked if we could come in the residence with her and search for any kind of documentation or any kind of illegal contraband.  She said she had no problem with that. . . .  I asked if we could come in and search for anything illegal. . . .  She said that was fine, she had no problem.

Koncir similarly testified that Gomez invited them "to go into the residence."  Gomez said she did not have her keys to the house, but Ohland gave her the keys he recovered from appellant after the arrest.  The conversation began near the SUV and continued while they walked toward the house.  Ohland was wearing his badge, but most of the officers were in plain clothes.  One marked patrol car was parked at the residence, as well as at least four unmarked vehicles.

Gomez went inside the house, and the officers waited in the carport area.  Ohland retrieved an audio recorder to document Gomez's consent.  Ohland asked Gomez to speak with him again.  He testified that Gomez was "less accommodating" during the audio-recorded conversation.  He asked Gomez some background questions about her and appellant, and then the following can be heard:[5]

OFFICER:  Well, like we explained to you, we're — we're just conducting an ongoing investigation and we'd like your consent to come in and make sure there's nothing illegal in your residence.  Do we —

GOMEZ:  Okay —

OFFICER:  Can we have your consent to do that?

GOMEZ:  Well, I mean, what is it for, though?  I mean — you know?  I don't understand why.

OFFICER:  You're not in any trouble, ma'am.  Uh, it's to us to, to go through your house.

OFFICER:  We just want to get in here and, and [inaudible].

GOMEZ:  Well, I thought y'all needing um, um, documents for my husband.

OFFICER:  We do.

_____
[5] "OFFICER" is used for any officer speaking on the recording.  Several different voices can be heard.

4

OFFICER: We do. And that's what we're — we're asking for, to get those documents and to see —

GOMEZ: I don't have any documents.

OFFICER: — if there's anything else in this house.

GOMEZ: He has noth — no documents.

OFFICER: Let's go.

GOMEZ: We don't have any papers, nothing — The only thing, I mean, I have [inaudible].

OFFICER: Yeah, we'll come in with you. Can I come in there with you?

GOMEZ: Uh, yeah, I'm okay with it. I'm [inaudible] my paperwork. I don't have anything. I mean, like I said, this is all my paperwork. I'll show you all my paperwork.

Ohland testified that Gomez made a gesture with her head and hands to invite the officers inside, and, "I believe I acknowledged her and said, Yes, we'll go with you. And then I stopped again before I went in the home and I asked her, Can I come in with you? And she told me, Yes." The officers entered the home. Vanderberry testified, "As we stepped in I saw the living room. I looked to my right and the door was open and it's another bedroom and at that time I saw what was a kilogram press along with what appeared to be drug paraphernalia on the table." The recording continues:

OFFICER: Okay.

GOMEZ: I don't have anything.

OFFICER: Well, do, do you all have anything illegal in the house?

GOMEZ: No, sir.

OFFICER: Any kind of weapons?

GOMEZ: No, sir.

OFFICER: Any kind of drugs?

GOMEZ: No, sir.

OFFICER: Uh, any large amounts of currency —

GOMEZ: No.

OFFICER: — that we would need to, okay, that's what we're concerned

5

| | |
|---|---|
| | with. |
| GOMEZ: | Okay. |
| OFFICER: | Uh, if we can get your consent to make sure that you don't have any of that in here, as long as there's nothing like that in here — |
| GOMEZ: | Okay. |
| OFFICER: | — we'll be on our way. |
| GOMEZ: | Uh, I mean, it's fine with me, but I don't understand why this is all necessary, you know? If, if my husband — I told you who my husband is. |
| OFFICER: | Right. |
| GOMEZ: | I don't have any documents, anything. |
| OFFICER: | About, about him? |
| GOMEZ: | I'm telling you, his name is, what I told you. |
| OFFICER: | Okay. |
| GOMEZ: | That's his name. Um — |
| OFFICER: | Well, maybe you could go room to room with us, while we're checking if you're worried about — |
| OFFICER: | Yeah, yeah, we'll go with you — |
| OFFICER: | — if we tear up the house or something — |
| GOMEZ: | No, no, it's not that. It's just, I'm, I mean, if all y'all came is for documents, I mean, I'll tell y'all, I don't have any documents for him. |
| OFFICER: | Okay, well, just like I explained to you, we — |
| GOMEZ: | Because I've been with him for a year. |
| OFFICER: | We also have to follow certain steps. We just need to make sure there's nothing illegal in the house. |
| GOMEZ: | Okay. I mean. |
| OFFICER: | Okay. Well, we appreciate that. And I, you're, you're being cooperative with us is going to go a long way, okay? Thank you. |
| GOMEZ: | [inaudible] |
| OFFICER: | You want to come here and sit in the living room? |
| OFFICER: | Is there anything, anything in the house that we need to know |

6

|        | about?                                                                    |
|--------|---------------------------------------------------------------------------|
| OFFICER: | She said they don't have anything.                                      |
| GOMEZ:   | No, I don't —                                                           |
| OFFICER: | So we should be pretty quick.  Uh, we'll secure it.                      |
| GOMEZ:   | I mean, I don't understand.                                             |
| OFFICER: | Make sure it's, make sure there's no people.                            |
| GOMEZ:   | I don't, why, I mean.                                                   |
| OFFICER: | And then we'll get out of the way.                                      |
| GOMEZ:   | My husband is, you know, Richard [inaudible].                           |
| OFFICER: | The time is now 9:15.  We're going to clear the house, make sure that it's safe. |

Vanderberry testified that the officers then performed a "security sweep" because when he was looking at the table, he "saw what appeared to be a handgun."[6]  During the security sweep, Vanderberry saw two assault rifles in a bedroom closet.  He prepared a search warrant that a magistrate signed the same night to authorize a search for cocaine. Vanderberry's probable cause affidavit stated:

> Jaquelin Gomez invited your Affiant and Sgt. Ohland into her residence . . . to provide documents containing Ricardo Sanchez's name.  Upon entering the residence, your Affiant observed through an open door to the east a kilogram press, which is a criminal instrument used to compress bricks of powder cocaine.  Your Affiant also observed a table containing packaging for illegal narcotics and assorted drug paraphernalia, along with a clear plastic bag containing what appeared to be powder cocaine.  Your Affiant then conducted a safety sweep of the residence at which time he observed an AK-47 semi-automatic rifle and a Ruger mini 14 semi-automatic rifle sitting on top of a large safe in a bedroom closet.

A search conducted pursuant to the warrant resulted in the officers finding more contraband, including a large quantity of cocaine.

The State charged appellant for possession with intent to deliver cocaine weighing more than 200 grams and less than 400 grams.  *See* Tex. Health & Safety Code Ann.

---

[6] The item was later determined to be a lighter.

7

§§ 481.102(3)(D), 481.112(e) (Vernon 2010). Appellant filed three motions to suppress. The first motion challenged the reasonableness of the traffic stop. The second, titled "Motion to Suppress Evidence No. 2 Franks v. Delaware,"[7] alleged that the search warrant contained a false statement because "Gomez never gave consent for the police to enter the residence and if the police contend that consent was given it was not voluntary." The third motion to suppress alleged that the "affidavit in support of the search warrant does not contain adequate information to provide a neutral magistrate with probable cause to issue the search warrant."

The trial court denied all of the motions to suppress at the conclusion of an evidentiary hearing.[8] Regarding the second motion, the court made an oral finding that "consent was voluntarily given and, therefore, . . . the statements in the warrant were truthful based on the officers' testimony."

Appellant pled guilty, was sentenced to 25 years' imprisonment, and filed a timely notice of appeal.

## ANALYSIS

Appellant challenges the trial court's denial of his motions to suppress in four issues: (1) "Gomez never gave consent to enter or to search the home;" (2) "If consent were given, it would have been involuntary and invalid;" (3) "Any consent was invalidated by the illegal entry into the enclosed patio;" and (4) "Even if voluntary consent existed, the protective sweep was still invalid." The State contends that appellant failed to preserve several points of error, and the trial court's findings are supported by the record.

We hold that the trial court correctly denied the motions to suppress because (1) the record supports a finding that Gomez voluntarily consented to the officers' entry into her home, where officers found drug paraphernalia in plain view; (2) the alleged illegal

---

[7] *Franks v. Delaware*, 438 U.S. 154 (1978).

[8] Gomez did not testify at the hearing.

8

entry did not taint Gomez's consent; and (3) the search warrant affidavit is sufficient to establish probable cause even if the protective sweep was unlawful.

## I. Preservation of Error

A motion to suppress is a specialized objection to the admission of evidence. *Rothstein v. State*, 267 S.W.3d 366, 373 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). "Rule 33.1(a) of the Texas Rules of Appellate Procedure provides that a complaint is not preserved for appeal unless it was made to the trial court 'by a timely request, objection or motion' that 'stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context.'" *Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009) (quoting Tex. R. App. P. 33.1); *see also* Tex. R. Evid. 103, *quoted in Resendez*, 306 S.W.3d at 312.

"The purpose of requiring a specific objection in the trial court is twofold: (1) to inform the trial judge of the basis of the objection and give him the opportunity to rule on it; (2) to give opposing counsel the opportunity to respond to the complaint." *Resendez*, 306 S.W.3d at 312. To preserve error, a party "must be specific enough so as to 'let the trial judge know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it.'" *Id.* at 313 (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)). A party fails to preserve error when the contention urged on appeal does not comport with the specific complaint made in the trial court. *See Rothstein*, 267 S.W.3d at 373.

We must consider the context of the complaint to determine if the party preserved error. *See Resendez*, 306 S.W.3d at 313. Accordingly, we will review the motions and suppression hearing to determine if the complaint was apparent from the context. *See id.* at 315–16 (reviewing record of the suppression hearing to determine if error preserved); *Rothstein*, 267 S.W.3d at 374–75 & n.5 (same); *see also Keeter v. State*, 175 S.W.3d 756, 760 (Tex. Crim. App. 2005) (issue may be preserved for appeal when litigated during the

9

hearing on the motion to suppress and the legal and factual questions were intertwined).

## A. Revocation of Consent

The State contends appellant's argument that Gomez "withdrew or revoked" her consent during the audio recording was not preserved for appellate review. Appellant argues in his first issue on appeal that Gomez did not consent during the audio recording, and "the tape shows she reconsidered and was admittedly 'less accommodating.'" Appellant argued in his second motion to suppress that "Gomez never gave consent for the police to enter the residence and . . . [consent] was not voluntary." Appellant made this argument at the beginning of the suppression hearing and reiterated it during closing argument. In particular, he argued that no consent could be heard in the audio recording. When the trial court ruled Gomez's consent was voluntarily given, the court announced that it had considered "the testimony the Court heard as well as the audiotape."

We hold that this complaint comports with appellant's objection in the trial court and was apparent from the context of the suppression hearing. The issue was litigated and involved overlapping legal and factual issues. Any distinctions between the evidence concerning Gomez's unrecorded statements and recorded statements are within the totality of the circumstances to be considered when evaluating whether she voluntarily consented to a search. *See Valtierra v. State*, 310 S.W.3d 442, 448 (Tex. Crim. App. 2010) ("The validity of an alleged consent to search is a question of fact to be determined from the totality of the circumstances.").

Appellant preserved error for his first issue.

## B. Protective Sweep

The State contends appellant did not preserve error regarding the validity of the protective sweep. Appellant argues in his fourth issue that the protective sweep was invalid because the officers "did not have a reasonable, articulable suspicion that the house harbored a dangerous person," and the audio recording "clearly shows that the protective sweep was initiated automatically and immediately upon entry."

10

Appellant argued in his third motion to suppress that the affidavit in support of the search warrant did not contain adequate information to supply a magistrate with probable cause to issue a search warrant. In particular, appellant argued that (1) the affidavit "contains no time frame as to when the officers made entry into the house;" and (2) "No information is contained in the affidavit to justify a safety sweep of the residence which [led] to the observation of guns." Although appellant did not significantly argue the protective sweep issue at the hearing on the motion to suppress, the issue presented in the written motion and the one presented on appeal involve overlapping legal and factual inquiries concerning whether the sweep was lawful. A safety sweep is "justified" only if officers have a reasonable, articulable suspicion that the house harbors a dangerous person. *See generally Reasor v. State*, 12 S.W.3d 813, 815–17 (Tex. Crim. App. 2000) (citing *Maryland v. Buie*, 494 U.S. 325 (1990)). Accordingly, we conclude appellant's complaint on appeal comports with his objection in the trial court.

Appellant preserved error for his fourth issue.

## II.     Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Valtierra*, 310 S.W.3d at 447. First, we afford almost total deference to the trial court's determination of historical facts. *Id.* The trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Id.* Regardless of whether we are reviewing the trial court's express or implied findings, we must view the evidence in the light most favorable to the trial court's ruling to determine whether the evidence supports these findings. *See id.*[9]

Second, we review *de novo* a trial court's application of the law of search and

_____

[9] Appellant suggests this court "can evaluate the recording for itself, *de novo*," citing *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000). But generally, "the deferential standard of review . . . applies to a trial court's determinations of historical facts when that determination is based on a videotape recording admitted into evidence at a suppression hearing." *Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006). It is appropriate to defer to the trial court's primary fact-finding function even for recorded evidence when the recording "does not indisputably refute the trial court's finding." *State v. Gobert*, 275 S.W.3d 888, 892 n.13 (Tex. Crim. App. 2009).

seizure to the facts. *Id.* We will sustain the trial court's ruling if that ruling is reasonably supported by the record and is correct on any theory of law applicable to the case. *Id.* at 447–48.

## III. Consent

"The entry into a residence by police officers is a 'search' for purposes of the Fourth Amendment, but an owner's or occupant's voluntary consent makes that entry constitutionally 'reasonable.'" *Id.* at 448. Consent must be "positive," but it "may be given orally or by action, or shown by circumstantial evidence." *Id.* Consent is not voluntary if it is coerced by explicit or implicit means, implied threat, or covert force. *Meekins v. State*, 340 S.W.3d 454, 458–59 (Tex. Crim. App. 2011) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973)). Nor is consent voluntary when it results from "'no more than mere acquiescence to a claim of lawful authority.'" *Carmouche v. State*, 10 S.W.3d 323, 331 (Tex. Crim. App. 2000) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). The ultimate question is whether the person's will has been overborne and the capacity for self-determination critically impaired. *Meekins*, 340 S.W.3d at 459.

"The validity of an alleged consent to search is a question of fact to be determined from the totality of the circumstances." *Valtierra*, 310 S.W.3d at 448; *see also Meekins*, 340 S.W.3d at 459. In determining whether consent was voluntary, courts have considered nonexclusive factors such as (1) whether the consenting person was in custody and the length of any such detention; (2) whether the person was arrested at gunpoint; (3) whether the person had the option of refusing consent; (4) the constitutional advice given to the accused; (5) the repetitiveness of questioning; and (6) the use of physical punishment. *Flores v. State*, 172 S.W.3d 742, 750 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *see also Schneckloth*, 412 U.S. at 226. "Courts also consider the characteristics of the consenting person, including the person's youth, education, and intelligence." *Flores*, 172 S.W.3d at 750. Courts have also considered the number of officers present at the scene and whether they were armed. *See State v. Williams*, 312

12

S.W.3d 276, 284 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Generally the State must prove voluntary consent by clear and convincing evidence. *Valtierra*, 310 S.W.3d at 447.[10]

### A. Gomez Made a Positive Statement of Consent that Was Not Revoked During the Audio Recording

In his first issue, appellant contends that Gomez did not consent for the officers "to enter or to search the home." Ohland testified that while speaking with Gomez shortly after she exited the SUV, the officers "asked if we could come in the residence with her and search for any kind of documentation or any kind of illegal contraband. She said she had no problem with that. . . . I asked if we could come in and search for anything illegal. . . . She said that was fine, she had no problem." Koncir similarly testified that Gomez invited them "to go into the residence." Based on this evidence, the trial court could find that Gomez made a positive oral statement of consent before Ohland began the audio recording.[11]

Ohland testified that while the officers were standing in the carport area and recording the conversation with Gomez, she made a gesture with her head and hands to invite the officers inside: "I believe I acknowledged her and said, Yes, we'll go with you. And then I stopped again before I went in the home and I asked her, Can I come in with you? And she told me, Yes." We have listened to the audio recording, as did the trial

---

[10] We note that appellant complained in the trial court that the search warrant contained a false statement concerning consent, citing *Franks v. Delaware*, 438 U.S. 154 (1978). Under that standard, the accused must prove "by a preponderance of the evidence that a falsehood made knowingly, intentionally, or with reckless disregard for the truth was included in a probable cause affidavit." *Janecka v. State*, 937 S.W.2d 456, 462 (Tex. Crim. App. 1996); *see also Hinojosa v. State*, 4 S.W.3d 240, 246–47 (Tex. Crim. App. 1999). Regardless of which burden applies, appellant's complaint is unmeritorious because there is ample evidence supporting the trial court's finding that Gomez voluntarily consented to the officers' entry.

[11] *See, e.g.*, *Sandoval v. State*, No. 04-08-00235-CR, 2009 WL 1028058, at *1–2 (Tex. App.— San Antonio Apr. 15, 2009, no pet.) (mem. op., not designated for publication) (consent when defendant said "there would be no problem" with search of his room); *Hurst v. State*, No. 05-07-00195-CR, 2008 WL 2152891, at *2–3 (Tex. App.—Dallas May 23, 2008, no pet.) (not designated for publication) (consent when defendant said he had "no problem" with search of his vehicle); *Castillo v. State*, No. 01-90-01077-CR, 1992 WL 49883, at *3 (Tex. App.—Houston [1st Dist.] Mar. 19, 1992, no pet.) (not designated for publication) (consent when defendant said he had "no problem" with search of his house).

court, and when the officers seem to be entering the house, an officer said, "Yeah, we'll come in with you. Can I come in there with you?" Gomez responded, "Uh, yeah, I'm okay with it." The audio recording does not indisputably refute Ohland's testimony; thus, we defer to the trial court's implied finding that Gomez gestured for the officers to enter her home. *See State v. Gobert*, 275 S.W.3d 888, 892 n.13 (Tex. Crim. App. 2009); *see also Meekins*, 340 S.W.3d at 463 & n.37. This exchange shows a positive expression of consent. *See Gallups v. State*, 151 S.W.3d 196, 201 (Tex. Crim. App. 2004) (consent when the defendant gestured for the officer to enter his house by extending his hand out and bringing it back toward him).[12]

Appellant contends the "defining moment" during the audio recording occurred when an officer told Gomez, "We just need to make sure there's nothing illegal in the house," and Gomez responded, "Okay." Appellant suggests "it is this statement that is alleged to be consent." This exchange, however, occurred after Gomez consented to the officers entering her house. Therefore, this exchange did not facilitate Vanderberry's plain view observation of drug paraphernalia. The ultimate search for cocaine was conducted pursuant to a warrant. Thus, whether Gomez consented to a "full" search of her house for anything illegal is not the question before us.[13] Nor was it the issue before the trial court: the motion to suppress, arguments at the suppression hearing, and oral

---

[12] *See also, e.g.*, *Merwin v. State*, 355 S.W.2d 721, 722 (Tex. Crim. App. 1962); (consent to search when defendant said "okay" in response to officer's request); *Cerda v. State*, 10 S.W.3d 748, 750–52 (Tex. App.—Corpus Christi 2000, no pet.) (same); *Fletes v. State*, No. 05-10-01012-CR, 2011 WL 2477848, at *2 (Tex. App.—Dallas June 23, 2011, no pet.) (mem. op., not designated for publication) (same).

[13] Officers may seize contraband observed in plain view after being invited into a residence. *See, e.g.*, *Alberti v. State*, 495 S.W.2d 236, 237 (Tex. Crim. App. 1973) (op. on reh'g); *Anderson v. State*, 787 S.W.2d 221, 228 (Tex. App.—Fort Worth 1990, no pet.); *Luevanos v. State*, 691 S.W.2d 60, 62 (Tex. App.—San Antonio 1985, pet. ref'd, untimely filed). Observing drug paraphernalia in plain view will generally establish probable cause to issue a search warrant for related contraband. *See Beaver v. State*, 106 S.W.3d 243, 248 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (probable cause established when officer observed drug paraphernalia and smelled marijuana odor while standing at entrance of front door); *see also Duhig v. State*, 171 S.W.3d 631, 639 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (search warrant for house was valid after officers discovered drugs and paraphernalia in plain view inside home). This is precisely the procedure the officers followed: obtaining a search warrant after discovering drug paraphernalia in plain view during a lawful, consensual presence in appellant's home.

pronouncement of the court all addressed consent in the context of *Franks v. Delaware* and the validity of the search warrant. The probable cause affidavit in this case does not state that Gomez consented to a search for illegal contraband. Rather, the affidavit states that Gomez "invited your Affiant and Sgt. Ohland into her residence." This statement is supported by the evidence presented at the suppression hearing.

Appellant's first issue is overruled.

## B. Gomez's Consent Was Voluntary Under the Totality of the Circumstances

In his second issue, appellant claims that any consent was involuntary when viewed under the totality of the circumstances because (1) Gomez's interaction with the officers "occurred in a highly stressful setting, at night in the midst of a heavy thunderstorm;" (2) her husband had just been arrested; (3) another relative had just been placed into custody at the scene; (4) there were four unmarked police vehicles and one marked police vehicle at the scene; (5) several officers were standing in the carport during the audio recording; (6) the officers had already caged her dog; (7) she was holding a crying infant in her arms; (8) the officers did not inform Gomez of her right to refuse their requests to search; and (9) the officers "set up camp in the enclosed patio for over two hours"[14] with the goal of gaining entry to the home by consent.

These facts do not suggest the trial court erred by concluding that Gomez voluntarily consented for the officers to enter her home. Appellant has not cited, and we have not found, a factually analogous case to support his argument. Appellant's authorities are distinguishable.

For example, we held in *Flores v. State* that the defendant's consent to search a house was involuntary when officers frisked him without reasonable suspicion, discovered marijuana on him, handcuffed him, placed him in the back of a patrol vehicle, did not give him *Miranda* warnings, and told him that his mother and young son would

---

[14] The record does not establish this assertion. Viewing the evidence with appropriate deference to the trial court's ruling, the officers' presence in the enclosed patio was brief.

be removed from the house if he did not consent. 172 S.W.3d at 751–52. The defendant's consent was "significantly undermine[d]" because the officers said the defendant's family would be removed from the house if he did not consent, although the officers had no basis for doing so. *Id.* at 752. Under these circumstances, the defendant's consent "was the result of coercive police tactics aimed at forcing appellant to consent to a search of his residence." *Id.* at 751. Here, although the record reflects that one of Gomez's family members had been detained in a police vehicle before Gomez spoke with the officers, there is no evidence that she was aware of the detention, and no threats were made to Gomez regarding her family that would undermine the voluntariness of her consent.

In *State v. Williams*, we affirmed the trial court's ruling that the defendant's consent was involuntary when immediately before the alleged consent, the defendant refused the search, began crying, and said she did not want to comply with the officer's request for her to pull out her bra — a search that was constitutionally unreasonable because a simple pat-down of the defendant's outer clothing would have sufficed. 312 S.W.3d at 283, 285–86. Here, there is nothing in the record to indicate Gomez refused the officers' request to enter her house or was overly distraught by the police presence and questioning. Although Ohland admitted that Gomez appeared nervous and her consent to search for illegal contraband was "less accommodating" during the audio recording, Gomez (1) verbally told officers that they could enter the house before reaching her property; (2) gestured for the officers to enter when the officers were standing in the carport area; and (3) again verbally told the officers, "Yeah, I'm okay with it," when they asked to come inside. There is no indication Gomez's will was overborne like the defendant's in *Williams*.

In *Carmouche v. State*, the Court of Criminal Appeals held that the record did not support a finding that the defendant's "consent, if given at all, was free and voluntary" when (1) the defendant had not been informed of his right to refuse consent; (2) he had already been involuntarily patted down during the traffic stop; (3) four officers

16

surrounded the defendant; (4) the officers told him to turn around and put his hands on the car; and (5) the officer asked for consent only after the officer was reaching toward the defendant's pants. 10 S.W.3d at 332–33. Under these circumstances, "a reasonable person would not have felt they had a choice to withhold consent to search." *Id.* at 333. Appellant argues that *Carmouche* is instructive because, by putting appellant's dog in a kennel and having a drug dog on the scene, "Gomez's house had, so to speak, assumed a 'search position.'" This record does not establish, however, that Gomez was even aware that the officers had a drug dog at the residence or had caged her dog.[15] Regardless, the officers' conduct in *Carmouche* of asking for consent while in the process of searching is materially different from asking to enter a house while standing in a patio. The defendant in *Carmouche* had no means of escape as he was surrounded by officers and "backed up against the hood of his car." *Id.* at 332. The record does not establish that Gomez was surrounded by the officers or "backed up" against a wall without means of egress. She had already entered her house without the officers by the time the recording began.

Further, unlike the defendants in the cases cited above, the record does not establish Gomez was detained or arrested at the time of consent.[16] And although it is a factor to consider, it is not required or essential that an individual be warned about the right to refuse a search. *See Meeks v. State*, 692 S.W.2d 504, 510 (Tex. Crim. App. 1985). In the absence of coercion, the officers' goal of obtaining consent is generally not relevant to whether Gomez voluntarily consented. *See Kentucky v. King*, 131 S. Ct. 1849, 1858 (2011) ("If consent is freely given, it makes no difference that an officer may have approached the person with the hope or expectation of obtaining consent.").

Finally, appellant's claims that the recording provides "a near-textbook example of mere acquiescence" to a claim of lawful authority, and that the officers' statements "conveyed the impression that officers would not leave unless and until Ms. Gomez gave

---

[15] We note that Gomez left her house earlier in the evening when appellant was still present, and Gomez's two relatives were at the house for about 30 minutes before Gomez was found in the SUV parked five houses away.

[16] Appellant does not contend Gomez was detained or arrested.

consent," are without merit. The officers' statements that appellant relies upon to make this argument were made after the officers obtained consent to enter the home. At this point, drug paraphernalia was in plain view. Under the totality of the circumstances, the trial court acted within its discretion to find that Gomez voluntarily consented for the officers to enter her home.

Appellant's second issue is overruled.

## C. The Alleged Illegal Entry Did Not Invalidate Gomez's Consent

In his third issue, appellant contends that any consent was "invalidated by the illegal entry into the enclosed patio." Assuming without deciding that the carport area was protected curtilage of appellant's house and the officers' entry before obtaining Gomez's consent was a violation of the Fourth Amendment, we hold that the State has proven by clear and convincing evidence that the taint otherwise inherent in the illegality of the entry had dissipated.

To determine whether a person's consent to search was tainted by an illegal entry, we apply the factors identified in *Brick v. State*, 738 S.W.2d 676 (Tex. Crim. App. 1987). *See, e.g.*, *Beaver v. State*, 106 S.W.3d 243, 250 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (citing *Leal v. State*, 773 S.W.2d 296, 297 (Tex. Crim. App. 1989)). These factors include: (1) the proximity of the consent to the illegal entry; (2) whether the illegal entry brought about police observation of the particular object which they sought consent to search; (3) whether the illegal entry was flagrant police misconduct; (4) whether consent was volunteered rather than requested by the officers; (5) whether the resident was made fully aware of his or her right to decline consent and thus prevent an immediate search of the residence; and (6) whether the police purpose underlying the illegality was to obtain consent. *Cooksey v. State*, 350 S.W.3d 177, 187 (Tex. App.—San Antonio 2011, no pet.); *Stone v. State*, 279 S.W.3d 688, 693 (Tex. App.—Amarillo 2006, pet. ref'd); *see Brick*, 738 S.W.2d at 680–81; *Beaver*, 106 S.W.3d at 250.

The first three factors favor the State; the fourth and fifth factors favor appellant;

18

and the sixth factor is neutral.  We will address each in turn.

1.    *Proximity.*  The alleged illegal entry into the carport area occurred before Gomez returned home and gave consent.[17]  Ohland testified that Koncir would have put the dog in the kennel between 6:00 p.m. and 7:00 p.m., but the interaction between the officers and Gomez's two relatives did not occur until after 8:00 p.m.  Another 30 minutes passed before the officers first spoke with Gomez.  Ohland testified that the officers had been in the carport area "way before" Gomez arrived at the home, and the K-9 drug dog had sniffed the exterior of the house before Gomez arrived.  None of the officers testified that they or any others were inside the carport at the time Gomez gave initial verbal consent for the officers to accompany her inside her home.[18]  Similarly, there is no evidence that Gomez was even aware that the officers had entered the carport area before her arrival.[19]

2.    *Observation of particular objects.*  Appellant does not contend this factor favors suppression; the officers did not observe any contraband as a result of an illegal entry.  Further, the carport area was visible through the wrought iron gate.

3.    *Flagrant misconduct.*  Multiple officers testified that the purpose of the entry into the carport area was to cage the dog for safety concerns and to perform a K-9 sniff.  There is no indication that the officers' entry was made for the purpose of causing "fear, surprise, or confusion."  *Cooksey*, 350 S.W.3d at 188 (not flagrant misconduct when stated purpose was officer safety); *see Stone*, 279 S.W.3d at 693–94 (not flagrant when stated purpose was to prevent destruction or removal of evidence); *Beaver*, 106

---

[17] As discussed above, Gomez gave consent initially for the officers to enter her residence shortly after she arrived and before the officers made the audio recording while standing in the carport area.

[18] Because Gomez gave verbal consent for the officers to enter her home before entering the carport herself, the officers' presence in the carport during the audio recording was entirely consensual, and thus, legal.  Accordingly, we reject appellant's contention that "[t]he supposed consent was given . . . simultaneously with the trespass."

[19] Appellant suggests that "Gomez would have been aware that the dog was caged," but there is nothing in the record to indicate that she was aware the **officers** had caged the dog.  Appellant was present at the house when she left earlier in the day, and two of Gomez's relatives were at the home for at least 30 minutes before Gomez exited the SUV, which was parked five houses away.

19

S.W.3d at 250 (not flagrant when officers merely violated Fourth Amendment by exceeding lawful scope of the search); *cf. Orosco v. State*, Nos. 01-11-00558-CR, 01-11-00559-CR, __ S.W.3d __, 2012 WL 2924473, at *10 (Tex. App.—Houston [1st Dist.] July 12, 2012, no pet. h.) (third factor "neutral" when multiple officers knocked on appellant's doors and windows for 20 to 30 minutes and fired a shotgun at the neighbor's dog). Appellant contends caging the dog was flagrant because it was "the equivalent of picking a lock." We decline to adopt this analogy considering no case in Texas has addressed the propriety of police entering a carport area with a non-privacy fence, unlocked gate, a pit bull type dog, and "beware of dog" sign.[20]

**4. *Consent requested or volunteered.*** The officers requested Gomez's consent several times.

**5. *Awareness of rights.*** The audio recording does not reveal that the officers informed Gomez of her right to refuse the search. No officers testified that Gomez was informed of this right, and Ohland testified, "I don't think I'm required to tell her what her rights are as far as consent and all."

**6. *Purpose to obtain consent.*** The officers' testimony reveals that their purpose for entering the carport area was to secure the pit bull, which was done for two reasons: to allow a K-9 drug dog to sniff the front of the house, and to ensure officer safety in the event that the officers would conduct a search at a later time.[21] Officer Ohland admitted that they lacked probable cause to obtain a search warrant before entering the house; thus, the alleged illegal entry was intended to facilitate obtaining probable cause for a warrant or consent. Accordingly, the entry was at least partially

---

[20] Authorities from other jurisdictions are not particularly instructive. *Compare Madruga v. Cnty. of Riverside*, 431 F. Supp. 2d 1049, 1060–61 (C.D. Ca. 2005) (protected curtilage when solid concrete block and wood fence included "beware of dog" sign), *with United States v. Bausby*, No. 10-00236-CR-W-DGK, 2011 WL 5089437, at *4–5 (W.D. Mo. Sept. 29, 2011) (no protected curtilage when front yard enclosed by chain-link fence and included "beware of dog" sign; contraband supporting the search warrant included an allegedly stolen motorcycle sitting in front yard and advertised "for sale").

[21] Further, Koncir testified, "[Vanderberry] and I were standing there talking, you know, if we do get consent or we get a search warrant for the house, what are we going to do with the dog because then you have to start worrying about calling animal control and that type of thing."

intended to facilitate a later search, but not necessarily to obtain consent.

In conclusion, at least three factors favor the State, and the first and third factors appear to be of particular importance in this case because the alleged Fourth Amendment violation occurred far in advance of Gomez's arrival, and there is no evidence that she knew of the violation before giving officers consent to enter her home. It is especially significant that Gomez was not present while the alleged misconduct occurred. *See Beaver*, 106 S.W.3d at 251 ("significant" that the defendant was unaware of the misconduct when he gave consent). "[B]ecause there is no evidence that [Gomez] was aware of the illegality in this case, it is not likely that [her] consent was tainted by it." *See id.* (noting that only two factors favored appellant).

Appellant's third issue is overruled.

## IV. Protective Sweep

In his fourth issue, appellant contends that the protective sweep was invalid because the officers lacked a "reasonable, articulable suspicion that the house harbored a dangerous person," and the "sweep was automatic upon entry and was not triggered by any observations." Assuming without deciding that the protective sweep was unlawful, the search conducted pursuant to the warrant remained valid.

The inclusion of tainted allegations in a search warrant affidavit "does not necessarily render a resulting search warrant invalid." *Castillo v. State*, 818 S.W.2d 803, 805 (Tex. Crim. App. 1991), *overruled on other grounds by Torres v. State*, 182 S.W.3d 899 (Tex. Crim. App. 2005). The relevant inquiry for a search conducted pursuant to a warrant containing tainted allegations is "to put aside the tainted allegations and determine whether the independently acquired and lawful information clearly established probable cause." *State v. Bridges*, 977 S.W.2d 628, 632 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (citing *Castillo*, 818 S.W.2d at 805). "If the search warrant could have been issued based on the untainted information in the affidavit, then the search warrant is valid." *Id.* (citing *Brown v. State*, 605 S.W.2d 572, 577 (Tex. Crim. App.

1980)); *see also Brackens v. State*, 312 S.W.3d 831, 838 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) ("If the tainted information was clearly unnecessary to establish probable cause for the search warrant, then the defendant could not have been harmed by the inclusion of the tainted information in the affidavit." (internal quotation omitted)).

Vanderberry testified in the affidavit that he observed drug paraphernalia in plain view — a kilogram press, narcotics packaging materials, and a clear plastic bag containing what appeared to be powder cocaine — *before* initiating a protective sweep. Only then did the officers perform a protective sweep and discover two semi-automatic rifles. The officers did not discover any cocaine or additional drug paraphernalia during the protective sweep. Vanderberry's testimony at trial is consistent with his affidavit, and the audio recording does not indisputably refute his testimony.[22]

Accordingly, we will review the sufficiency of the affidavit after excising the allegation concerning the protective sweep. We generally review a magistrate's decision to issue a warrant with great deference. *Jones v. State*, 364 S.W.3d 854, 857 (Tex. Crim. App. 2012). "After reviewing the supporting affidavit in 'a commonsensical and realistic manner,' a reviewing court must uphold the magistrate's decision so long as the magistrate had a substantial basis for concluding that probable cause existed." *Id.* (quoting *State v. McClain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011)). "'Where facts and circumstances within the knowledge of a police officer, arising from a reasonably trustworthy source, would warrant a man of reasonable caution in the belief that items of contraband or evidence of a crime may presently be found in a specified place, there is probable cause to issue a warrant to search that place.'" *Bridges*, 977 S.W.2d at 632 (quoting *Cassias v. State*, 719 S.W.2d 585, 587 (Tex. Crim. App. 1986)); *see also Flores*

---

[22] The audio recording does not contain an oral announcement of Vanderberry's plain view observation of drug paraphernalia before an officer says that they will "secure" the house and "clear the house, make sure that it's safe." But the omission of such an announcement does not negate Vanderberry's testimony that he observed drug paraphernalia in plain view as he stepped into the house. We defer to the trial court's resolution of any conflict between the testimony and reasonable inferences gleaned from the audio recording. *See, e.g.*, *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008) ("[T]he party that prevailed in the trial court is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.").

*v. State*, 319 S.W.3d 697, 703 (Tex. Crim. App. 2010) ("Probable cause for a search warrant exists if, under the totality of the circumstances presented to the magistrate, there is at least a 'fair probability' or 'substantial chance' that contraband or evidence of a crime will be found at the specified location.").

After excising the allegations concerning the protective sweep, the relevant portions of Vanderberry's affidavit appear as follows:

> Upon entering the residence, your Affiant observed through an open door to the east a kilogram press, which is a criminal instrument used to compress bricks of powder cocaine. Your Affiant also observed a table containing packaging for illegal narcotics and assorted drug paraphernalia, along with a clear plastic bag containing what appeared to be powder cocaine. ~~Your Affiant then conducted a safety sweep of the residence at which time he observed an AK-47 semi-automatic rifle and a Ruger mini 14 semi-automatic rifle sitting on top of a large safe in a bedroom closet.~~

> Based on the foregoing, I think it is reasonable to believe that the items sought, a drug, controlled substance, immediate precursor, chemical precursor or other controlled substance, property, including apparatus or paraphernalia kept, prepared or manufactured in violation of the laws of this state, to wit: suspected cocaine, will be found at said location.

We conclude that the search warrant remains valid because it could have been issued based on the untainted information contained in Vanderberry's affidavit. A magistrate would have had a substantial basis for concluding probable cause existed to search for cocaine based on Vanderberry's plain view observation of cocaine paraphernalia. *See Duhig v. State*, 171 S.W.3d 631, 639 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (search warrant for house was valid after officers discovered drugs and paraphernalia in plain view inside home); *Beaver*, 106 S.W.3d at 248 (probable cause established for search of house when an officer observed drug paraphernalia and smelled marijuana odor while standing at entrance of front door); *Waugh v. State*, 51 S.W.3d 714, 717 (Tex. App.—Eastland 2001, no pet.) (probable cause established for warrant to search a house when an officer saw a bong through the open front door of the house).[23]

_____

[23] *See also Perez v. State*, 514 S.W.2d 748, 749 (Tex. Crim. App. 1974) (police had probable

Appellant's fourth issue is overruled.

**CONCLUSION**

Having overruled all of appellant's issues, we affirm the trial court's judgment.


/s/     William J. Boyce
            Justice


Panel consists of Justices Boyce, Christopher, and Jamison.

Do Not Publish — Tex. R. App. P. 47.2(b).

---

cause for warrantless search of the defendant when he was found unconscious near drug paraphernalia); *Stephens v. State*, No. 09-10-00488-CR, 2011 WL 2732253, at *3 (Tex. App.—Beaumont July 13, 2011, no pet.) (mem. op., not designated for publication) (probable cause for search of a vehicle was established by officer's plain view observation of crack pipe); *cf. Parker v. State*, 206 S.W.3d 593, 601 (Tex. Crim. App. 2006) (probable cause to search a house was established when: police received a tip that juveniles were consuming alcohol at the house; a person inside the house looked out a window and said, "It's the police;" someone who appeared to be a juvenile ran upstairs; a strong odor of marijuana emanated from inside the house; and an officer knew the defendant, who had been arrested during a prior encounter); *Wiede v. State*, 157 S.W.3d 87, 97–98 (Tex. Crim. App. 2005) (no probable cause to search vehicle for controlled substance based on driver's furtive gesture when there was "no indication that any alcohol, drugs, or drug paraphernalia were in plain view").